IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NIGEL NICHOLAS DOUGLAS, : 
 : 
    Plaintiff : 
 :     CIVIL NO. 1:12-CV-0340
    v. : 
 :     (Judge Caldwell)
LANIER, *et al.*, : 
 : 
    Defendants : 


M E M O R A N D U M

## I.   *Introduction*

        *Pro se* plaintiff, Nigel Douglas, is a federal inmate formerly incarcerated at

Allenwood United States Penitentiary (USP Allenwood), in White Deer, Pennsylvania.[1]  On

February 15, 2012, he filed this *Bivens*-type civil-rights action[2] alleging the denial of medical

care and deliberate indifference to his medical needs following a surgical procedure to treat

an enlarged prostate.  Douglas also alleges Dr. Chopra, his urologist, "was not entirely

truthful" when he said the procedure was safe and that he would not suffer from any

"erectile or genital related difficulties" following it.  (Doc. 1, Compl.).  Since the procedure

Douglas suffers from erectile dysfunction.  Named as defendants are the following Bureau

of Prisons (BOP) employees: Health Services Administrator (HSA) Lanier, Dr. Buschman,

Physicians Assistant (PA) Holtzapple, PA Craig, PA Duttry and PA McDonald.[3]  Dr. Chopra,

---

[1]  Douglas is presently housed at FCC Victorville, in Adelanto, California.

[2]  *Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics*, 403 U.S. 388, 91
S.Ct. 1999, 29 L.Ed.2d 619 (1971).  A *Bivens* action is the counterpart to 42 U.S.C. § § 1983 claims
brought against state officials.  *Egervary v. Young*, 366 F.3d 238. 246 (3d Cir. 2004).

[3]  These defendants will be collectively referred to as the BOP defendants.

not employed by the BOP, is also a defendant.[4]

We are considering the following motions: (1) the BOP defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56; (2) Plaintiff's motion for enlargement of time to complete discovery; and (3) Plaintiff's motion to compel (Doc. 34). We will grant the BOP defendants' motion for summary judgment and deny Plaintiff's motions. We will also direct Plaintiff to provide the court with an updated address for Dr. Chopra.

II. *Standard of Review*

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this evaluation, all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *MacFarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 271 (3d Cir. 2012).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'" *Roth v. Norfalco*, 651 F.3d 367, 373 (3d Cir. 2011) (citing *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). "[S]ummary judgment is essentially 'put up

---

[4] Dr. Chopra's Waiver of Service was returned unexecuted on August 22, 2012. (Doc. 15).

or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. *Liberty Lobby*, 477 U.S. at 256-57, 106 S.Ct. at 2514. "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231 - 232 (3d Cir. 2001). Allegations made without evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). "Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

III. *Background*

In his Complaint, Douglas alleges that following his Prostiva procedure, performed by Dr. Chopra, he suffered several extended bouts of painful urinary retention prior to the BOP defendants' providing him remedial treatment. He also claims that since the procedure he suffers from retrograde ejaculation.[5]

---

[5] Retrograde ejaculation occurs when semen enters the bladder instead of emerging through the penis during orgasm. Although the male can still reach sexual climax, he may ejaculate
(continued...)

The summary judgment record is as follows. Douglas arrived at USP Allenwood on March 20, 2008. (Doc. 32, BOP Def's.' Statement of Material Facts (DSMF), ¶ 1; Doc. 39, Plaintiff's Counter Statement of Material Facts (PSMF), ¶ 1). On May 17, 2010, Douglas underwent a Prostiva procedure without complication at an outside facility. (Doc. 1, Compl., ECF P. p. 13; DSFM ¶ 2; Doc. 31-2 at ECF P. p. 16) Prostiva is a surgical procedure to destroy excess prostate tissue which may improve urination. (DSMF ¶ 2). Dr. Chopra, a local urologist, performed the Prostiva procedure.[6] (DSMF ¶ 3; PSMF ¶ 3). Dr. Chopra's discharge instructions to BOP Health Services staff directed that Douglas's catheter be removed May 19, 2010, if his urine was clear, and to continue with his antibiotics and Cardura,[7] and to follow up with the urology clinic in two to three months. (DSMF ¶ 3). A follow-up consultation was submitted so Douglas could attend the urology clinic. (DSMF ¶ 4). PA Holtzapple reviewed the clinical encounter note for Douglas on May 18, 2010. (DSMF ¶ 5).

On May 19, 2010, Douglas reported to the Health Services Unit at 8:33 a.m. to have his catheter removed. (DSMF ¶ 6; PSMF ¶ 6). He was seen by PA Craig. (DSMF ¶ 8; PSMF ¶ 8). PA Craig is a Lieutenant with the Public Health Service. (Doc. 31-2, Craig Decl., ¶ 1.) At the time, Douglas's urine was clear and he was not in pain. (DSMF ¶ 7;

---

[5](...continued)
very little or no semen. *See* http://www.mayoclinic.com/health/retrograde-ejaculation/DS00913.

[6] The parties dispute whether Dr. Chopra is a constructive employee of the BOP based on his role in operating on Douglas. (DSMF ¶ 3; PSMF ¶ 3). Counsel for the BOP defendants has not entered an appearance for Dr. Chopra.

[7] Doxazosin (Cardura) is used to treat the symptoms of an enlarged prostate which include difficulty urinating (hesitation, dribbling, weak stream, and incomplete bladder emptying), painful urination, and urinary frequency and urgency. *See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693045.html*

PSMF ¶ 7).  PA Craig removed Douglas's catheter without issue.  (DSMF ¶ 8; PSMF ¶ 8).

PA Craig continued Douglas's antibiotic and Cardura.  (DSMF ¶ 9; PSMF ¶ 9).  Douglas

was instructed to return to the Health Services Unit as needed.  (DSMF ¶ 10; Doc. 31-2,

ECF P. p. 14).

       Later that day, at approximately 6:37 p.m., Douglas returned to the medical

unit complaining of severe sharp abdominal pain and urinary retention.  (DSMF ¶ 11; Doc.

31-2, ECF P. p. 11).  Douglas reported that he had not been urinating since the catheter

was removed earlier that day.  (DSMF ¶ 12; PSMF ¶ 12).  Emergency Medical Technician-

Paramedic (EMT-P) Lesher's assessment of Douglas was "post operative urinary

retention/urethral swelling".  (DSMF 14; Doc. 31-2, ECF P. p.11).  After a straight catheter

was inserted by EMT-P Lesher, Douglas felt immediate relief and voided approximately 400

cc of dark urine.  (DSMF ¶¶ 15-16; PSMF ¶¶ 15-16).  EMT-P Lesher contacted Dr.

Buschman, a Medical Officer who works at the facility, who concurred with the course of

treatment.  (DSMF ¶ 18; PSMF ¶ 18; Doc. 31-1, ECF P. p. 3).

       At approximately 8:18 p.m., Douglas reported to the Health Services Unit, for

the third time that day.[8]  (DSMF ¶ 19; Doc. 31-2, ECF P. p. 9).  Douglas reported the

catheter had fallen out and that he was again suffering from distention and severe pain.

(DSMF ¶¶ 19-20; PSMF ¶¶ 19-20).  EMT-P Lesher made two unsuccessful attempts to

catheterize Douglas.  (Doc. 31-2, ECF P. p. 8).  Douglas was given 2 tablets of

Acetaminophen/Codeine 300/30 mg.  (*Id.*)

---

    [8]  Plaintiff disputes the timing of his return to the medical unit.  *See* PSMF ¶ 19.  He avers
that he returned to the unit at approximately 5:30 p.m. as soon as he left the unit because his
catheter fell out.  (*Id.*)

EMT-P Lesher then contacted Dr. Buschman regarding transporting Douglas to an outside hospital for further assistance/evaluation. (DSMF ¶ 22; PSMF ¶ 22). EMT-P Lesher also contacted Health Services Administrator (HSA) Laino. HSA Laino (a non-defendant), arrived at USP Allenwood at 9:00 p.m. to evaluate Douglas.[9] (DSMF ¶ 23). HSA Laino also tried unsuccessfully to catheterize Douglas. (DSMF ¶ 24; PSMF ¶ 24). At approximately 10:15 p.m., HSA Laino contacted Dr. Chopra to advise him of the situation. (DSMF ¶ 26; PSMF ¶ 26; Doc. 31-2, ECF P. p. 6). Dr. Chopra advised that Douglas may be having spasms which were preventing the insertion of the catheter. (DSMF ¶ 27; PSMF ¶ 27). Dr. Chopra advised HSA Laino to make a final attempt at inserting a catheter, and if unsuccessful, to transfer Douglas to the local hospital for medical treatment. (DSMF ¶ 28; PSMF ¶ 28). HSA Laino made one more attempt to insert a catheter as instructed, but was unsuccessful. (DSMF ¶ 29; PSMF ¶ 29).

At approximately 11:25 p.m., Douglas was transported to a local hospital for medical treatment. (DSMF ¶ 30; PSMF ¶ 30; Doc. 1, ECF P. p. 13). At the local hospital, a catheter was inserted and Douglas was advised to follow-up with Dr. Chopra in two days. (DSMF ¶ 31; PSMF ¶ 31). Douglas returned to the facility at approximately 1:30 a.m. (DSMF ¶ 32; PSMF ¶ 32).

On May 20, 2010, Dr. Bushman reviewed Douglas's condition with HSA Laino and PA Holtzapple. (DSMF ¶ 33; PSMF ¶ 33). Dr. Bushman directed PA Holtzapple to ensure Douglas's catheter was still in place and to start him on 0.8 mg Flomax to reduce

---

[9] Douglas avers that HSA Laino arrived at the institution at 11:50 p.m. *See* PSMF ¶ 23. Although this is a dispute of fact, it is not material for reasons set forth *infra*.

his prostate spasms.[10]  (DSMF ¶¶ 34-36; Doc. 31-2; ECF P. p. 5).  On May 20, 2010, PA Holtzapple prescribed Douglas 0.8 mg of Tamsulosin,[11] for twelve days.  (DSMF ¶ 38; PSMF ¶ 38; Doc. 31-2, ECF P. p. 3).

On May 24, 2010, PA Holtzapple spoke with Dr. Chopra's office about discontinuing Douglas's catheter.  (DSMF ¶ 39; PSMF ¶ 39).  PA Holtzapple flushed Douglas's catheter as directed by Dr. Chopra.  (DSMF ¶¶ 39-40; PSMF ¶¶ 39-40).  Douglas's catheter was discontinued without complication.  (DSMF ¶¶ 39-40; PSMF ¶¶ 39-40).  Douglas was told that if he had any problems urinating he was to report to the Health Services Unit immediately.  Douglas understood the plan of care.  (DSMF ¶ 41; PSMF ¶ 41; Doc. 31-2, ECF P. p. 1).

Following the removal of his catheter at 8:00 a.m. on May 24, 2010, Douglas claims his urine flow gradually decreased until it stopped all together around 11:00 p.m. on May 25, 2010.  (Doc. 1, ECF P. ¶ 13).  On May 26, 2010, Douglas reported to Health Services Unit during insulin line.  (DSMF ¶ 42; PSMF ¶ 42 ).  He told EMT-P Duttry that he has been unable to urinate since his catheter was removed two days before.  (DSMF ¶ 43; PSMF ¶ 43).  He stated that when he forces himself to try and urinate, he only gets dribbles; has had increasing abdominal discomfort; feels bloated; and has been unable to sleep.  (DSMF ¶ 43; PSMF ¶ 43).  Douglas stated that he has been taking his medication as prescribed as well as taking painkillers.  (DSMF ¶ 44; PSMF ¶ 44; Doc. 31-1, ECF P. p. 41).  Douglas argues that any pain medication he was given was "used up well before the

---

[10]  Douglas argues he never received Flomax prior to August 12, 2010, when Dr. Chopra ordered it.  *See* PSMF ¶ 34.

[11]  Tamsulosin is the generic form of Flomax.  *See* http://www.webmd.com/drugs/drug-1592-tamsulosin+oral.aspx?drugid=1592&drugname=tamsulosin+oral

next encounter." PSMF ¶ 44.

Dr. Buschman was contacted by telephone and advised to have the physician assistant on call come to the institution and attempt to insert a foley catheter. (DSMF ¶ 45; PSMF ¶ 45). PA Bennett-Meehan was contacted and advised of the situation. (DSMF ¶ 46; PSMF ¶ 46). Douglas was advised that PA Bennett-Meehan had been called and would be arriving soon. (DSMF ¶¶ 46-47; PSMF ¶¶ 45-47; Doc 31-1, ECF P. p. 41). Once PA Bennett-Meehan arrived at the facility, she spent approximately one hour attempting to insert the catheter for Douglas. (DSMF ¶¶ 46 and 48; PSMF ¶ 46 and ¶ 48). The medics were advised they may issue Douglas Tylenol as needed for pain. (Doc. 31-1, ECF P. p. 44). Dr. Buschman was then called to the institution and successfully placed the catheter providing Douglas immediate relief. (DSMF ¶ 48; PSMF ¶ 48; Doc. 31-1, ECF P. p. 42).

On May 27, 2010, Dr. Buschman contacted Dr. Chopra who advised him to leave Douglas's catheter in until Monday before attempting another trial of voiding. He also recommended increasing Douglas's Flomax dosage and to add Ibuprofen for pain. (DSMF ¶ 49; PSMF ¶ 49; Doc. 31-1, ECF P. p. 40). On May 27, 2010, Dr. Buschman ordered Douglas's Tamsulosin dosage increased from 0.4 mg daily to 0.8 mg daily and prescribed him 600 mg Ibuprofen three times daily for one week. (Doc. 31-1, ECF P. p. 40).

On June 2, 2010, Douglas was placed in the Special Housing Unit (SHU). (Doc. 31-1, ECF P. p. 38). He denied any injuries or illnesses at that time. (*Id.*) On June 3, 2010, PA Craig saw Douglas in his SHU cell to remove his foley catheter. (DSMF ¶ 50; Doc. 31-1, ECF P. pp. 34-36). The catheter was removed without incident. (*Id.*) Douglas was given a new prescription to help with his urinary burning. (DSMF ¶ 52; PSMF ¶ 52). PA Craig also renewed Douglas's other chronic medications (Aspirin, Doxazin, Ibuprofen;

Niacin and Simvastatin).  (DSMF ¶ 53; PSMF ¶ 53; Doc. 31-1, ECF P. p. 35).  He was also advised to follow up as needed with Health Services staff.  (DSMF ¶ 53; PSMF ¶ 53; Doc. 31-1, ECF P. p. 35).

On July 20, 2010, PA Craig saw Douglas in the SHU for a Chronic Care Visit. (DSMF ¶ 54; PSMF ¶ 54; Doc. 31-1, ECF P. pp. 29-32).  Douglas related that his symptoms were better after his prostate procedure but that he was having an increase in the frequency of urination.  (DSMF ¶ 54; PSMF ¶ 54).  PA Craig treated Douglas for a fungal rash and ordered lab work for other chronic conditions.  (DSMF ¶ 55; PSMF ¶ 55). PA Craig also renewed Douglas's medications (Clotrimazole Cream; Aspirin; Doxazosin; and Simvastin).  (DSMF ¶ 55; PSMF 55; Doc. 31-1, pp. 30-31).  Douglas was advised to follow up with Health Services staff as needed.  (DSMF ¶ 56; PSMF ¶ 56).

On August 12, 2010, Douglas had a follow-up appointment with Dr. Chopra for his benign prostatic hypertrophy (non-cancerous enlarged prostate).  (DSMF ¶ 57; PSMF ¶ 57).  At the appointment Douglas complained of frequency and marginal stream (poor flow) of urine.  (DSMF ¶ 58; PSMF ¶ 58; Doc. 31-1, ECF P. p. 26-27).  Douglas was restarted on Flomax and Ditropan[12] to relax the bladder.  (DSMF ¶ 59; Doc. 31-1, ECF P. p. 26).  Douglas was scheduled to be seen at the next in-house urology clinic.  (DSMF ¶ 60; PSMF ¶ 60).

On August 24, 2010, PA Craig saw Douglas in the SHU after he complained of difficulty urinating.  (DSMF ¶ 61; PSMF ¶ 61; Doc. 31-1, ECF P. pp. 23-24).  PA Craig

---

[12]  Ditropan is the brand name for Oxybutynin. Oxybutyin is used to control urgent, frequent, or uncontrolled urination in people who have an overactive bladder.
*See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682141.html#brand-name-1.

noted Douglas underwent a Prostiva procedure in May 2010 which required him to undergo several catheter placements. (DSMF ¶ 62; PSMF ¶ 62). PA Craig recorded Douglas's Pain Scale as "0" that day, but did note that Douglas had suprapubic distention with tenderness on palpation but no guarding or rigidity. (Doc. 31-1, ECF P. p. 23). PA Craig made two unsuccessful attempts to catheterize Douglas. (DSMF ¶ 63; PSMF ¶ 63). PA Craig then contacted Dr. Chopra's office and was advised to take Douglas to Bloomsburg Hospital. (DSMF ¶ 64; PSMF ¶ 64). Douglas was sent to Bloomsburg Hospital at approximately 11:47 a.m., and returned to the institution at 3: 56 p.m. (DSMF ¶¶ 64-65; PSMF ¶¶ 64-65; Doc. 1, ECF P. p. 13). Douglas returned from the outside hospital with a foley catheter in place and a prescription for Ciprofloxacin (an antibiotic) and Phenazopyridine (a pain medication). (DSMF ¶ 66; PSMF ¶ 66; Doc. 31-1, ECF P. p. 21). Douglas's diagnosis was urinary retention. (DSMF ¶ 67; PSMF ¶ 67; Doc. 31-1, ECF P. p. 21).

On September 1, 2010, Douglas was seen by Dr. Chopra where a voiding trial was completed. (DSMF ¶ 68; PSMF ¶ 68). Dr. Chopra discontinued Douglas's Ditropan (for bladder spasms) but continued his Flomax and Ciprofloxacin medications. (DSMF ¶ 69; PSMF ¶ 69). Douglas was directed to follow-up at the next urology clinic. (DSMF ¶ 70; PSMF ¶ 70. He was given a straight catheter to use if he could not urinate. (DSMF ¶ 71; PSMF ¶ 71). Dr. Chopra recommended Douglas have a cystoscopy. (DSMF ¶ 72; PSMF ¶ 72). PA Craig submitted the necessary consultation request so Douglas could get a cystoscopy. (DSMF ¶ 73; PSMF ¶ 73; Doc. 31-1, ECF P. p. 18).

On September 20, 2010, Douglas was transferred from USP Allenwood. (DSMF ¶ 74; PSMF ¶ 74; Doc. 1, ECF P. p. 13).

IV.    *Discussion*

The BOP defendants argue summary judgment should be granted in their favor because: (1) they are entitled to sovereign immunity to the extent they are being sued in their official capacities; (2) PA Craig is entitled to statutory immunity as a Public Health Service Official; and (3) Douglas has failed to state an Eighth Amendment claim for deliberate indifference to his serious medical needs.

A.    *Sovereign Immunity*

Under the doctrine of sovereign immunity, the United States is immune from suit unless Congress has expressly waived the defense of sovereign immunity by statute. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983). A suit against a government officer in his or her official capacity is, in essence, a suit against the government. *Kentucky v. Graham*, 473 U.S. 159, 165-55, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). The United States has not consented to be sued for monetary damages based on a constitutional violation or, in other words, for a "*Bivens*-type cause of action directly against a federal agency." *F.D.I.C. v. Meyer*, 510 U.S. 471, 486, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994).

The BOP defendants correctly point out that Douglas fails to specify in his Complaint whether he is suing them in their official and/or personal capacities. (Doc. 31, BOP Def's.' Br. in Supp. Mot. Summ. J., ECF P. p. 4.) In his Complaint, Douglas simply avers that the BOP defendants "are all employed as Health Services providers at USP Allenwood." (Doc. 1, Compl., ECF P. p. 2). Thus, to the extent that Douglas is suing the BOP defendants for monetary damages in their official capacities, his claim is barred, and

summary judgment will be granted in favor of the BOP defendants, in their official capacities.[13]  *See Webb v. Desan*, 250 F. App'x 468, 471 (3d Cir. 2007)(nonprecedential)(affirming dismissal of prisoner's *Bivens* claim for damages against BOP employees in their official capacities).

      B.      *PA Craig Has Statutory Immunity under the Public Health Service Act*

      The Public Health Service Act, 42 U.S.C. § 233(a), provides that an action against the United States under the Federal Tort Claims Act (FTCA) is the exclusive remedy "for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment."  See 42 U.S.C. § 233(a).  As such, the Public Health Service Act grants absolute immunity to Public Health Service officers from *Bivens* actions "arising out of the performance of medical or related functions within the scope of their employment."  *Hui v. Castaneda*,559 U.S. 799, 806, 130 S.Ct. 1845, 1851, 176 L.Ed.2d 703 (2010); *see also Etkins v. Glenn*, ___ F. App'x ___, ___, 2013 WL 2392872, at *2 (3d Cir. 2013)(nonprecedential)(affirming district court's denial of a motion to add Public Health Service employee as additional defendant because she is entitled to absolute immunity from *Bivens* claims).

      Douglas asserts that PA Craig violated his constitutional rights under the

---

[13]  As for Douglas's request for injunctive or declaratory relief from the defendants named in this action, those claims are now moot given his transfer from USP Allenwood to another facility. *See Fortes v. Harding*, 19 F. Supp. 2d 323, 326 (M.D. Pa. 1998) ("Fortes' transfer to another institution moots any claims for injunctive or declaratory relief.").

Eighth Amendment when he ignored, denied, delayed and interfered with his repeated requests for medical care while housed in the SHU between August 18, 2010, and August 24, 2010. (Doc. 1, Compl., ¶¶ 23-27; Doc. 37, Pl.'s Br. in Opp'n Def.'s' Mot. Summ. J., ECF P. p. 9). Douglas argues that at all times relevant to this action PA Craig worked jointly with the BOP to provide him medical care and therefore is not entitled to immunity. (*Id.*) Nonetheless, it is not disputed that PA Craig is a Lieutenant with the Public Health Service, and was acting within the scope of his official duties when he was dealing with Douglas. Thus, Douglas cannot maintain a *Bivens* action against PA Craig, a Public Health Service employee, for harm arising out of alleged constitutional violations committed while acting within the scope of his employment. Accordingly, PA Craig is entitled to summary judgment in his favor as to Douglas's *Bivens* claims against him.

     C.    *Douglas Fails to State An Eighth Amendment Claim of
           Deliberate Indifference Against the Remaining BOP Defendants*

     The Eighth Amendment "requires prison officials to provide basic medical treatment" for those "incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)(*citing Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To establish an Eighth Amendment medical claim, a plaintiff must show "(I) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

     A finding of deliberate indifference must be based on what an official actually knew, rather than what a reasonable person should have known. *See Beers–Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001). A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).

A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted). Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). "Needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose . . . violates the Eighth Amendment." *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003).

An inmate's mere disagreement with medical professionals "as to the proper medical treatment" of his medical complaint does not support an Eighth Amendment violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). A claim that a doctor or medical department was negligent does not rise to the level of an Eighth Amendment violation simply because the patient is a prisoner. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *see also Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2002)(claims of

medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).  Accordingly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice."  *Id.* at 107, 97 S.Ct. at 293.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."  *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).

In sum, negligence, unsuccessful medical treatment, or medical malpractice do not give rise to a § 1983 cause of action, and an inmate's disagreement with medical treatment is insufficient to establish deliberate indifference.  *See Spruill,* 372 F.3d at 235; *Durmer,* 991 F.2d at 69; *Winslow v. Prison Health Servs., Inc.*, 406 F. App'x 671, 675 (3d Cir. 2011)(nonprecedential)(conservative hernia treatment of non-strangulated or incarcerated hernia rather than surgery, although not the preferred treatment by the prisoner, did not rise to a constitutional claim).

Here, Douglas suggests that on three occasions (5-19-10, 5-26-10 and 8-21 through 8-24-10) his serious medical need, urinary retention, "was not addressed for hours while he waited in excruciating pain for treatment."  (Doc. 37, ECF P. pp. 14-15).  Defendants argue that the evidence does not show deliberate indifference.  Rather, they suggest that on each occasion Douglas was constantly evaluated, catheters were inserted or he was sent to an outside hospital, and he was prescribed medication.[14]

The court's review of the record demonstrates that the BOP defendants were not deliberately indifferent to Douglas's serious medical needs in their responses to his May

---

[14]  As for Douglas's denial that he received Flomax when prescribed, the record before the court clearly demonstrated that when prescribed, he received the generic equivalent to Flomax.

and August requests for medical attention due to urinary retention.  Although Douglas complains that he was required to wait extended periods of time, in pain, until medical staff treated and/or attempted to resolve his medical issue, the record before us reflects that on all occasions, BOP medical staff were attentive to his needs, did not deny or delay his medical treatment for non-medical reasons, or ignore Douglas's complaints of pain.  While in all of these situations, ultimate relief was only attained by his successful catheterization, and may not have occurred as quickly as he would have liked, on each occasion defendants attempted to relieve his pain with medication, contacting others who had additional medical expertise than they for assistance, or transported him to an outside hospital to relieve his discomfort.

To the extent Douglas complained of pain, he was prescribed medication (*see* Doc. 31-2, ECF P. p. 8; Doc. 31-1, ECF P. pp. 40, 41, and 44).  If as Douglas says his pain medication ran out at any time, he does not suggest that he requested additional supplies, or that he was denied the same by the BOP defendants.  Douglas was advised by all medical providers to return to the Health Services Unit immediately if he experienced difficulties urinating.  As evidenced by his three trips to the medical unit on May 19, 2010, he did not have difficulty accessing medical care that day.  While he disputes how long it took for defendants to ultimately transfer him to an outside facility where he was successfully catheterized, he does not dispute that EMT-P Lesher and PA Laino both attempted to relieve his discomfort by trying to catheterize him and by discussing his situation with Dr. Chopra, his urologist.[15]

---

[15] To the extent Douglas suggests that PA Laino arrived at the facility closer to 11:50 p.m.
(continued...)

Douglas concedes that he was repeatedly advised to contact the medical unit if he had difficulty urinating. He also admits that he waited almost two days to present to the medical unit on May 26, 2010, even though he was experiencing problems urinating. (Doc. 31-1, p. 41). Again, while Douglas was dissatisfied with treatment EMT-P Duttry provided, his concerns were not ignored. EMT-P Duttry noted that Douglas was taking his medications, including his pain killers, and that he consulted Dr. Buschman as to a course of action to treat Douglas. (*Id.*) PA Bennett-Meehan arrived at the facility and attempted to assist him by inserting a catheter. Unfortunately, her efforts were unsuccessful. Tylenol was administered and Dr. Buschman was contacted. (*Id.*, ECF P. pp. 43-44). Dr. Buschman arrived at the facility and successfully catheterized Douglas, providing immediate relief. (*Id.*, ECF P. p. 42). There is no indication that any BOP defendant delayed providing Douglas medical care for non-medical reasons, or for the purpose of causing him harm.

Once Douglas was placed in the SHU, he again was seen regularly by medical staff for his chronic care and urinary issues. (Doc. 31-1, ECF P. pp. 25-38). On Tuesday, August 24, 2010, Douglas reported experiencing "difficulty with urination staring

---

[15](...continued)
rather than 9:00 p.m. as set forth in the medical record, and allowed him to languish in pain during this time, he offers no evidence to support his assertion. (PSMF ¶ 23). Moreover, the record before the court suggests the contrary. Douglas's medical record includes a notation that PA Laino arrived at the facility at approximately 9:00 p.m., and that he too made several attempts to catheterize Douglas. Once unable to do so, he contacted Dr. Chopra. (Doc. 31-2, ECF P. p. 6). Douglas does not dispute these events. He also does not dispute that he was taken out of the facility to the local hospital at approximately 11:25 p.m. (Doc. 1, ECF P. P. p. 13). These events contradict Douglas's time line because if PA Laino arrived at the facility at 11:50 p.m., he would not have encountered Douglas as he had already left for the outside hospital, and PA Laino would not have had sufficient time to attempt repeated catheterizations or contact Dr. Chopra prior to his transport, all events that Douglas agrees took place.

over weekend."[16] (Doc. 31-1, ECF P. p. 24). His "Pain Scale" was noted to be "O". (*Id.*, ECF P. p. 23). After PA Craig unsuccessfully attempted to insert a catheter on two occasions, PA Craig contacted Dr. Chopra's office. Within an hour and a half of presenting his issue to medical staff, Douglas was transported to an outside hospital for treatment.

The undisputed record before the court, which includes portions of Douglas' medical records, reveals that BOP medical staff addressed Douglas's medical concerns. They gave him pain medication, anti-spasmodic medication for his bladder, catheters, and an outside hospital visit when he had problems urinating. He was repeatedly evaluated and monitored by BOP staff for his chronic care needs and his bladder issues. Douglas's dissatisfaction with the treatment rendered, or the order in which it was rendered, does not state an Eighth Amendment claim. Any perceived delay in medical care was not prolonged and was accompanied by Douglas's receipt of pain medication and further efforts to assist him void his bladder. Nothing within the record suggests that the BOP defendants were indifferent to Douglas's urinary retention and associated pain.[17]

D.    *Douglas' s Discovery Motions Will Be Denied*

Also pending before the court are Douglas's motions for an extension of time to complete discovery[18] (Doc. 33) and a motion to compel the BOP defendants to respond

---

[16] Although Douglas suggests he attempted to obtain medical treatment prior to this date, he does not offer any evidence to support this assertion.

[17] While Douglas also complains that Dr. Chopra failed to inform him that the potential side effects of the Prostiva procedure include difficulty in obtaining an erection or retrograde ejaculation, this claim does not involve the BOP defendants and is lodged solely against Dr. Chopra.

[18] Douglas did not file a brief in support of this motion as required by Pa. M.D. Local Rule
(continued...)

-18-

to previously posed discovery (Doc. 34).

Both motions request that the BOP defendants produce Douglas's medical records.  On September 15, 2012, Douglas served the BOP defendants with a discovery request which requested the disclosure of his medical records.  On October 5, 2012, the BOP defendants sought a protective order staying their obligation to respond to Douglas's discovery request.  In doing so, they noted that relevant portions of Douglas's medical record would be provided to Douglas in connection with their shortly anticipated motion for summary judgment.  (Docs. 18-19).  On October 16, 2012, the court granted the BOP's motion for a protective order.  (Doc. 24).

On November 21, 2012, the BOP defendants filed their motion for summary judgment.  On December 5, 2012, they filed their statement of undisputed facts, supporting brief and exhibits, which included relevant portions of Douglas's medical records.  (Docs. 30-32).  Douglas also had the opportunity to review his medical record upon request by contacting the appropriate official at his institution.  Douglas does not suggest that any relevant portion of his medical record necessary for him to oppose the BOP defendants' motion for summary judgement is missing from the court's record.  Likewise, he does not suggest what discovery, if any, he would pursue that would affect the outcome of the pending motion for summary judgment.

For these reasons, Douglas's motion for extension of time to complete discovery (Doc. 33) and motion to compel (Doc. 34) will be denied.

_____

[18](...continued)
7.5.  Thus the defendants had no obligation to respond to it, and it is deemed withdrawn.

E.    *Updated Service Information for Dr. Chopra*

By an order dated June 18, 2012, the court directed service of Douglas's Complaint on the named defendants, including Dr. Chopra.  (Doc. 11, Order).  On August 23, 2012, Dr. Chopra's Waiver of Service was returned unexecuted with the notation "Unable to serve, mail returned by USP Allenwood - Dr. Chopra is not employed with Federal Bureau of Prisons -Plaintiff must provide U.S. MS with address for defendant to execute service."  (Doc. 15).  Douglas received a copy of this correspondence.  To date, service of process has not been made on Dr. Chopra.

Fed. R. Civ. P. 4(m) provides:

> If a defendant is not served within 120 days after the complaint is filed, the court - on a motion or on its own after notice to the plaintiff - must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.  This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

More than twelve months have passed since the filing of the Complaint and Douglas has not provided the court or the Marshal sufficient information for the Marshal to effect service on Dr. Chopra.  When advised of a problem in accomplishing service, a *pro se* litigant proceeding *in forma pauperis* must "attempt to remedy any apparent service defects of which [he] has knowledge."  *Rochon v. Dawson*, 828 F.2d 1107, 1110 (5th Cir. 1987).  The court will direct Douglas to provide sufficient information to enable the Marshal

to serve Dr. Chopra.  His failure to do so will result in the dismissal of Dr. Chopra from the action pursuant to Fed. R. Civ. P. 4(m).

An appropriate order follows.

/s/ William W. Caldwell
William W. Caldwell
United States District Judge

Date:  September 11, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NIGEL NICHOLAS DOUGLAS,      :
                                      :
      Plaintiff                  :
                                        :      CIVIL NO. 1:12-CV-340
    v.                          :
                                        :      (Judge Caldwell)
LANIER, *et al.*,                :
                                        :
      Defendants          :

*O R D E R*

AND NOW, this 11th day of September, 2013, it is ordered that:

1.  The BOP Defendants' Motion to Dismiss and for Summary Judgment (Doc. 30) is GRANTED.  The Clerk of Court shall enter judgment in favor of defendants Buschman, Craig, Duttry, Holtzapple, Lanier and McDonald and against plaintiff Douglas on all claims.

2.  Plaintiff's Motion for Extension of Time to Complete Discovery (Doc. 33) is DENIED.

3.  Plaintiff's Motion to Compel Discovery (Doc. 34) is DENIED.

4.  Within twenty-one (21) days of the date of this order, Plaintiff shall file with the court sufficient information for the Marshal to effect service on defendant Dr. Chopra.  If Plaintiff fails to do so, this action will be dismissed as against Dr. Chopra.

                              /s/ William W. Caldwell
                              William W. Caldwell
                              United States District Judge